UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Thomas Hunziker as trustee for the next of kin of ALH, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| Patricia Doherty, in her individual capacity; County of Hennepin, Minnesota; Robert Marshall, M.D.; Kristen Medhanie; Allina Health System; Sherrie Dirk; and Bryce Dirk, | **JURY TRIAL DEMANDED UNDER FED. R. CIV. P. 38(b)** |
| Defendants. | |

For his Complaint, Plaintiff Thomas Hunziker ("Hunziker") as trustee for the next of

kin of ALH states and alleges as follows:

## Introduction

1.      ALH was a healthy and happy two-year-old girl when Hennepin County, the

State's largest child welfare agency, placed her and her brother with foster parents, the

Dirks.  Hennepin County was advised against ALH's placement with the Dirks but

proceeded with the placement anyway.  ALH, like all children and adults, immutably

needed food, water, and love.  Through a community of failures, ALH was deprived of

each of these needs and many more.

2.      For a year, ALH was starved, dehydrated, bound, immobilized, and

abandoned in a home littered in trash and smelling of urine.  During that year, ALH

physically and mentally deteriorated.  Her height dropped from the 88th percentile to the

7th percentile.  Her weight dropped from the 98th percentile to the 5th percentile.  She ripped out clumps of her hair and skin and engaged in other self-harm.  She became socially withdrawn.  She ate rocks, pea gravel, dirt, paper, crayons, and trash because the Dirks would not feed her.  While living with the Dirks, ALH exhibited countless other signs and symptoms indicative of neglect and abuse.  She also exhibited obvious and objectively serious medical and mental health needs.

3.      ALH's social worker and medical providers became aware of these "red flags," but they did nothing to help her.  Instead, ALH's suffering continued unchecked and unabated.  Hennepin County failed to protect ALH, provide for welfare, and failed to ensure that her serious medical and mental health needs were met.  ALH's medical providers failed to act within the standards of care.

4.      ALH died on November 6, 2017.  Sherrie Dirk sedated ALH with medication ALH was improperly prescribed, wrapped her in bedsheets, and then left her alone and immobilized in her room for hours.  ALH was so malnourished, dehydrated, sedated, and restrained that she could not even try to save herself.  Hours later, Bryce Dirk finally checked on her and found ALH lifeless and stiff.  By the time the paramedics arrived, ALH's body was so rigid from rigor mortis that they could not even open her mouth to begin CPR.

5.      ALH's death was preventable.  She could have been saved by any of the defendants to this action, but she was not.

6.      Hennepin County's child welfare system is broken.  Too many children have died because of the County's deliberate indifference to the safety and health of these vulnerable foster children.  This lawsuit seeks to hold all those who failed to protect ALH

accountable for their actions so that no other child will have to endure such a torturous death.

7.      This is an action for money damages and injunctive relief arising out of the multi-leveled negligence, professional malpractice, and deliberate indifference to ALH's welfare and serious medical needs, in violation of ALH's well-settled federal civil rights and state law protections.

## Jurisdiction

8.      Hunziker brings this action to vindicate ALH's federal civil rights pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3). These statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

9.      Hunziker also asserts supplemental state law claims for medical malpractice, negligence, and wrongful death pursuant to Minn. Stat. § 573.02.  These state law claims are so related to the civil rights claims, over which this Court has original jurisdiction, that they form part of the same case or controversy, as all of the alleged conduct arises from a common nucleus of operative facts. Therefore, this Court has supplemental jurisdiction over Hunziker's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     The relevant acts and omissions occurred in the State of Minnesota; therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

11.     The notice requirements of Minn. Stat. § 466.05 have been satisfied, to the extent necessary, as each government actor or entity herein had sufficient facts to reasonably put them on notice.

**Parties**

**ALH**

12.     ALH began residing with Hunziker and Mary Egan ("Egan") in or around April 2015.  ALH was ten months at the time.

13.     In or around May 2015, ALH was legally and involuntarily removed from her mother's custody and placed in Hennepin County's (a/k/a County of Hennepin) custody.

14.     ALH continued to reside with her grandparents, Hunziker and Egan, following the removal as a temporary foster placement.

15.     On or around October 21, 2015,  legal custody of ALH was transferred to Hennepin County by and through the Hennepin County Human Services and Public Health Department.

16.     In September 2016, Hennepin County placed ALH in a foster home with the Dirks, where she remained until her death on November 6, 2017.

17.     ALH was just three years old when she died.

**Sherrie Dirk**

18.     Upon information and belief, Sherrie Dirk ("Sherrie") was at all times material hereto a citizen of the United States and a resident of the State of Minnesota.

19.     Sherrie was ALH's foster mother from September 2016 until her death in November 2017.

20.     Sherrie is now in the custody of Minnesota Department of Corrections,

serving a 384-month prison sentence in MCF-Shakopee for the second-degree murder of ALH.

### Bryce Dirk

21.     Upon information and belief, Bryce Dirk ("Bryce") was at all times material hereto a citizen of the United States and a resident of the State of Minnesota.

22.     Bryce was ALH's foster father beginning in September 2016 until her death in November 2017.

23.     Bryce is now in the custody of the Minnesota Department of Corrections, serving a 150-month prison sentence in MCF-Moose Lake for the second-degree murder of ALH.

### Thomas Hunziker

24.     Hunziker is ALH's paternal grandfather.

25.     Hunziker was appointed trustee for ALH's next of kin on January 9, 2020, by Hennepin County District Court Judge Thomas S. Fraser.  *See* Case No. 27-cv-20-352.

26.     As a result, Hunziker has standing to pursue ALH's federal constitutional claims and state law claims for damages on behalf of ALH's next of kin.

### Patricia Doherty

27.     Upon information and belief, Patricia Doherty was at all times material hereto a citizen of the United States and a resident of the State of Minnesota.

28.     Doherty was working under color of state law as a social worker employed by Hennepin County and working in the Hennepin County Human Services and Public

Health Department.

29.     Doherty served as a social worker (or similar) role for ALH from at least September 2016 until the time of ALH's death.

30.     Doherty thereby had a duty to monitor and care for ALH's safety and welfare and is sued in her individual capacity with respect to the federal civil rights claim.

31.     Doherty was working within the course and scope of her employment with Hennepin County at all times material hereto.

### County of Hennepin

32.     Hennepin County is a public corporation subject to suit pursuant to Minn. Stat. § 373.01.

33.     Hennepin County is, and was at all times material hereto, the political and corporate body charged with control and supervision over all personnel of the Hennepin County Human Services & Public Health Department, which includes Children and Family Services and Child Protection Services – the Hennepin County agencies, divisions, or departments charged with caring for ALH's safety and welfare once she was placed in foster care.

34.     Hennepin County had legal custody of ALH from October 21, 2015 through all times material hereto.

35.     Hennepin County thereby had a duty to monitor and care for ALH's safety and welfare.

36.     All references to Hennepin County herein include each of its agencies, subdivisions, and departments, including but not limited to the Hennepin County Human

Services and Public Health Department.

## Dr. Robert Marshall

37.     Upon information and belief, Dr. Robert Marshall ("Dr. Marshall") was at all times material hereto a citizen of the United States and a resident of the State of Minnesota.

38.     In 2016 and 2017, Dr. Marshall worked as a licensed medical practitioner employed by Allina Health System and provided health care at the Allina Health Maple Grove Clinic ("Allina – Maple Grove").

39.     Dr. Marshall is a board-certified pediatrician.

40.     Dr. Marshall served as a medical provider for ALH from at least October 2016 until the time of ALH's death.

41.     Dr. Marshall thereby owed ALH a duty to provide her care within the appropriate standards of professional care.

42.     Dr. Marshall was working within the course and scope of his employment with Allina at all times material hereto.

## Nurse Kristen Medhanie

43.     Upon information and belief, Kristen Medhanie ("Nurse Medhanie") was at all times material hereto a citizen of the United States and a resident of the State of Minnesota.

44.     In October 2017, Nurse Medhanie worked as a nurse practitioner employed by Allina Health System and provided health care at Allina Health Brooklyn Park Clinic ("Allina – Brooklyn Park").

45.     Nurse Medhanie provided ALH with health care in October 2017.

46.     Nurse Medhanie thereby owed ALH a duty to provide her care within the appropriate standards of professional care.

47.     Nurse Medhanie was working within the course and scope of her employment with Allina at all times material hereto.

**Allina Health System**

48.     Allina Health System ("Allina") is a nonprofit domestic corporation pursuant to Minn. Stat. § 317A with its registered office at 2925 Chicago Ave Minneapolis MN 55407.

49.     Allina does business as Allina Health Maple Grove Clinic and Allina Health Brooklyn Park Clinic.

50.     ALH initially began receiving health care at Allina in 2015.

51.     ALH then received health care from Fairview University ("Fairview") from May 2015 through August 2016, while ALH was residing with her grandparents.

52.     ALH's care was transferred back to Allina in September 2016, where ALH continued to receive health care until her death in 2017.

53.     Allina's health care professionals, including but not limited to Dr. Marshall and Nurse Medhanie, thereby owed ALH a duty to provide ALH care within the appropriate standards of professional care.

**Facts**

### ALH's Placement in Foster Care

54.     In or around May 2015, Hennepin County involuntarily removed ALH and her brother from their mother's custody.

55.      Hennepin County temporarily placed ALH and her brother with their paternal grandparents, Hunziker and his wife, Egan.

56.     Both Hunziker and Egan are retired lawyers.

57.     On or around October 21, 2015, legal custody of ALH was transferred to the County of Hennepin (a/k/a Hennepin County) by and through the Hennepin County Human Services and Public Health Department.

58.     Hunziker and Egan, as both grandparents and licensed and supervised foster parents, lovingly and competently cared for ALH and her brother.

59.     ALH was healthy, well nourished, and happy in her grandparents' care.

60.     A May 13, 2015 medical record from Fairview described ALH as "a well baby with normal growth and development."

61.     While Hunziker and Egan loved ALH and her brother immensely, due to their advanced age they felt that it was in the best interests of the children to be raised by younger parents.

62.     Hunziker and Egan trusted Hennepin County to place ALH and her brother in a suitable home, free of neglect and abuse.

63.     Hunziker and Egan trusted that Hennepin County would place ALH in a home where she would continue to thrive, as she did while residing with Hunziker and

9

Egan.

64.     Fairview medical records from August 31, 2016, reflect that ALH "has been doing very well with paternal grandparents."

65.     Hunziker and Egan learned that Hennepin County was considering the Dirks as a foster placement.

66.     Prior to the placement with the Dirks, Egan informed Hennepin County that there were concerns about Sherrie not being a fit parent, which emanated from Sherrie's own family members.

67.     Upon information and belief, Hennepin County ignored Egan and did not investigate Egan's concerns.

68.     Hunziker and Egan also provided Hennepin County with two potential foster placements for the children, which Hunziker and Egan believed would be better suited to raise the children than the Dirks.

69.     Hennepin County ignored Hunziker and Egan's recommendations.

70.     On September 15, 2016, Hennepin County placed ALH and her brother in foster care with the Dirks in their chaotic home, which consisted of the Dirks' four children, two cats and a dog.

71.     Shortly thereafter, the Dirks applied to adopt ALH and her brother.

### The Nightmare Begins

72.     ALH and her brother moved into the Dirks' home in Brooklyn Park, Minnesota.

73.     The Dirks thought ALH was overweight and needed to eat less.  ALH was only two years old.

10

74.     The Dirks starved ALH.

75.     ALH began eating rocks, pea gravel, dirt, paper, crayons, and other non-food objects.

76.     ALH also ate food from the trash.

77.     The Dirks neglected ALH's hygiene.

78.     The Dirks home was littered in trash and smelled of animal urine.

79.     The Dirks "swaddled" ALH when she exhibited behaviors.

80.     The  Dirk's version of "swaddling" ALH consisted of binding her in bedsheets and leaving her alone in her room for hours.

81.     The Dirks admitted to "swaddling" ALH on average of three-to-four times per day to manage her behaviors.

82.     Upon information and belief, ALH would be "swaddled" for entire days and nights.

83.     The Dirks informed professionals such as Doherty, Dr. Marshall, and Nurse Medhanie that they were swaddling ALH.

84.     Doherty, Dr. Marshall, and Nurse Medhanie also knew from ALH's medical records that the Dirks were swaddling ALH.

85.     Doherty also knew from IEP and other records that the Dirks were swaddling ALH.

86.     Despite this knowledge of swaddling, Doherty, Nurse Medhanie, and Dr. Marshall each failed to diligently investigate what that meant, particularly given that swaddling a child ALH's age in any form is inconsistent with pediatric medical standards of care.

11

**The Warning Signs of Abuse and Neglect**

87.     The Mayo Clinic identifies classic warning signs of child abuse and neglect.

The Mayo Clinic calls these "red flags".  The list includes:

- o   self-harm or attempts at suicide;

- o   changes in behavior – such as aggression, anger, hostility or hyperactivity;

- o   depression, anxiety or unusual fears, or a sudden loss of self-confidence;

- o   a loss of previously acquired developmental skills;

- o   delayed or inappropriate emotional development;

- o   social withdrawal or a loss of interest or enthusiasm;

- o   eating disorders;

- o   poor growth and weight gain;

- o   poor hygiene; and,

- o   reluctance to leave school activities, as if he or she doesn't want to go home.

88.     ALH began exhibiting many of these signs and symptoms **after** moving into the Dirks' home.

89.     Social workers and medical professionals are supposed to be trained to look for warning signs of abuse and neglect and report suspected maltreatment.

90.     Children ALH's age do not have the means to protect themselves.

91.     Foster children depend on social workers to identify and report suspected maltreatment.

92.     Children depend on pediatricians and other medical professionals to identify

and report suspected maltreatment.

**Dougherty Ignores the Many Red Flags Indicative of Abuse and Neglect**

93.     ALH began experiencing serious behavioral and medical concerns that were indicative of child abuse and neglect shortly after being placed with the Dirks.

94.     It was reported that ALH started to engage in self-harming behavior as early as September 2016-the month she arrived at the Dirks.

95.     It was reported that ALH would scratch her face and hit herself.

96.     It was also reported that ALH would try to "take chunks out of her hands" and pull out chunks of her hair.

97.     In addition to the self-harming behavior, it was reported that ALH became aggressive, destructive to property, and oppositional.

98.     It was reported that ALH was sleeping abnormally and now wetting her bed.

99.     It was also reported that ALH was now crying often.

100.     It was reported that ALH was withdrawn, lacking eye contact, and using her social skills inconsistently.

101.     ALH developed anxiety and delays in her communication, adaptive skills and social-emotional skills.

102.     ALH's anxiety reached a level where it was reported that "[ALH] is picking at herself and has sores on her body from anxiety."

103.     ALH became significantly delayed in her social and emotional development.

104.     It was also reported that ALH was losing weight and "will eat paper labels and garbage out of the trash."

105.     Similarly, it was reported that ALH eats "dirt, pea gravel, chalk, stickers,

and sometimes crayons."

106.    There were concerns that ALH may have Pica—a psychological disorder characterized by an appetite for substances that are non-nutritive.

107.    Pica, itself, is a warning sign of child abuse.

108.    In just over a year's time, ALH's height dropped from the 88th percentile to the 7th percentile.

109.    In fact, the medical records reflect that ALH **shrunk** in height.

110.    On August 31, 2016, ALH's providers at Fairview measured ALH at 2'11.43" (88%).

111.    On October 19, 2017, when ALH was seen by Nurse Medhanie at Allina, ALH was measured at 2'11.24."

112.    In just over one year's time, ALH's weight went from the 98th percentile to the 13th percentile.

113.    On September 15, 2016, Allina personnel recorded ALH's weight as 34 lb. 9.6 oz. (98%).

114.    On October 19, 2017, when ALH was seen by Nurse Medhanie at Allina, ALH's weight was recorded as 27 lb. 11.2 oz (13%).

115.    It was also reported that the Dirks were managing ALH's tantrums by "swaddling" her.

116.    In fact, the Dirks reported to Doherty and others that "[ALH] will become upset 3-4 times per day where it is significant enough that they feel they need to swaddle her."

117.    Doherty knew that swaddling a child ALH's age was dangerous, contrary to

generally accepted professional standards, and contrary to Hennepin County practices, policies, and standards.

118. ALH developed chronic bloody noses *(5-10 times per day)* for an entire year.

119. In contrast to home, it was reported that ALH was happy and pleasant at school and did not engage in any self-harm.

120. It was also reported that ALH did not want to leave school—another warning sign that something was wrong at home.

121. Doherty was aware of **all** the warning signs reflected in paragraphs 88 through 116 and knew that these signs and symptoms arose after placement with the Dirks, but Doherty did nothing to help ALH.

122. Doherty neither helped ALH get the medical attention she needed, nor helped free her from the Dirks.

123. In late-September, Doherty conducted a house visit of the Dirks' residence. Doherty recorded a note from that visit that: **"The house was very dirty smelling of dogs, cats and urine. Plus, clothes and shoes every place made it difficult to walk into the door, especially with the odor."** (emphasis added).

124. Despite personally observing these unhealthy conditions, Doherty again did nothing to help ALH.

125. Doherty could barely stand being in the Dirks' home for a short home visit yet considered it okay for ALH to live in squalor there indefinitely.

126. Doherty failed to make an adequate inquiry into the extent of ALH's psychological well-being, despite her duties, and the obvious and serious harm of

repeatedly restraining a three-year-old child.

127.    Doherty knew that the Dirks were incapable of properly caring for ALH, and any reasonable social worker would have known that the Dirks were pursuing adoption of ALH for financial gain.

128.    Through these acts and others, Doherty was deliberately indifferent to ALH's safety, welfare, and serious mental and physical health needs.

**Allina Professionals Ignore the Red Flags Too**

129.    While ALH was in the Dirks' care, ALH received her medical care through Allina.

130.    Upon information and belief, Allina received ALH's medical records from Fairview referenced herein.

131.    Dr. Marshall was ALH's pediatrician working at Allina – Maple Grove.

132.    Nurse Medhanie was a family practice nurse practitioner at Allina – Brooklyn Park.

133.    Medical professionals, especially pediatricians and family practice nurses, are trained to look for and report any warning signs of child abuse and neglect.

134.    Dr. Marshall last saw ALH at Allina – Maple Grove on September 29, 2017.

135.    Nurse Medhanie last saw ALH at Allina – Brooklyn Park on October 19, 2017.

136.    Following the October 19, 2017 appointment, Nurse Medhanie and Dr. Marshall discussed ALH's care.

137.    By October 19, 2017, it was reported to Dr. Marshall, Nurse Medhanie, and others at Allina that:

16

o ALH was in foster care;

o ALH was engaging in self-harming behavior since arriving in foster care in September 2016;

o ALH was pulling out clumps of hair;

o ALH was having bloody noses (5-10 times daily) for a year before her foster mom reported these concerns;

o ALH had difficulty sleeping;

o ALH's foster mother "has to wrap ALH's arms in a blanket and hold her while sleeping so ALH doesn't scratch or pull her hair in her sleep and harm herself;

o ALH was eating paper, rocks, sand, and out of the trash;

o ALH may have Pica—a psychological disorder indicative of child abuse and neglect;

138.    ALH's medical records, which Dr. Marshall, Nurse Medhanie, and other Allina personnel had access to, reflect that in just over one year's time, ALH's height dropped from the 88th percentile to the 7th percentile, as discussed above.

139.    In addition, ALH's medical records, which Dr. Marshall, Nurse Medhanie, and other Allina personnel had access to, reflect that in just over one year's time, ALH's weight went from the 99th percentile to the 13th percentile, including losing three pounds, or ten percent of her body weight, in just six days at one point in December 2016.

140.    ALH's weight chart was requested by the medical examiner following her death.  It showed the following:

| Date | Weight (lbs, oz) | Percentile |
|------|------------------|------------|
| 02/08/2015 | 21, 10 | 99 |
| 03/15/2015 | 22, 7 | 98 |
| 09/15/2016 | 34, 9.6 | 98 |
| 10/05/2016 | 33, 6.4 | 96 |
| 12/03/2016 | 32, 0 | 87 |

| 12/09/2016 | 29, 0 | 62 |
| 08/09/2017 | 29, 3.2 | 34 |
| 09/28/2017 | 27, 9.6 | 14 |
| 10/19/2017 | 27, 11.2 | 13 |

141.    Any trained medical professional acting within the standard of care should have connected the dots between the drastic weight loss, lack of height growth (if not shrinking), and reports of eating non-food items, and concluded that ALH was being starved and otherwise being abused/neglected.

142.    Despite these and other warning signs for abuse and neglect, Dr. Marshall, Nurse Medhanie, and others at Allina never investigated, considered, or reported any suspected maltreatment by the Dirks nor did anything to stop it.

143.    Dr. Marshall and Nurse Medhanie also failed to conduct necessary diagnostic tests and take other actions to rule out abuse, neglect, or serious physical or mental health diagnoses.

144.    A reasonably competent and skilled health care professional would have recognized these signs of abuse and neglect and reported the suspected maltreatment to the appropriate authorities.

145.    Sherrie repeatedly sought medication for ALH, which Dr. Marshall and Nurse Medhanie both initially rejected.

146.    Nurse Medhanie also recommended that ALH be seen by the Assertive Community Treatment (ACT) Team, but Sherrie refused that recommendation because Sherrie feared it would derail ALH's final adoption hearing, which was scheduled for November 9, 2017.

147.    ACT "is an intensive nonresidential treatment and rehabilitative mental

18

health services provided according to the assertive community treatment model."

148.    More likely than not, the ACT Team would have identified that ALH was being neglected and abused.

149.    Nurse Medhanie knew that ALH needed to be seen by such professionals but failed to ensure it happened and failed to critically and clinically analyze Sherrie's rejection of these necessary services.

150.    Instead, Nurse Medhanie ignored this red flag and others.

151.    Due to Sherrie's persistence following the October 19, 2017 appointment, Dr. Marshall prescribed ALH .25 mg of guanfacine HCL (brand name, Tenex), once per day.

152.    Upon information and belief, Dr. Marshall made this prescription shortly after the October 19, 2017 appointment with Nurse Medhanie, and with Dr. Marshall having last seen ALH on September 28, 2017.

153.    Dr. Marshall claimed he made this Tenex prescription after conferring with ALH's child psychologist, Dr. Travis Dunn, but Dr. Dunn was **not** ALH's treating psychologist.

154.    ALH did not have a treating psychologist at Allina.

155.    Dr. Dunn does not see patients under the age of four.

156.    Dr. Marshall made this recommendation based upon an informal conversation with Dr. Dunn, without ever properly evaluating ALH for the suitability of a guanfacine prescription or critically assessing what was causing ALH's behavioral and emotional issues.

157.    For example, Dr. Marshall failed to properly evaluate ALH (e.g., heart rate,

blood pressure, weight) prior to prescribing her with Tenex.

158.    Due to the lowest pill dosage being 1 mg, Sherrie would be required to cut the pills before providing them to ALH.

159.    Dr. Marshall never instructed Sherrie how to cut these extremely small pills.

160.    C.S. Mott Children's Hospital at the University of Michigan reflects on its website that "Tenex is **not** approved for use by anyone younger than 12 years old." *See* guanfacine, *available at* https://www.mottchildren.org/health-library/d00717a1 (last accessed Oct. 18, 2020); *see also* guanfacine (Oral Route), *available at* https://www.mayoclinic.org/ drugs-supplements/guanfacine-oral-route/before-using/drg-20064131 (last accessed Oct. 18, 2020) ("Appropriate studies have not been performed on the relationship of age to effects of guanfacine tablets in children younger than 12 years of age.  Safety and efficacy have not been established.").

161.    Prior to prescribing any child with Tenex, a prescribing physician is supposed to assess a child's weight or if they are dehydrated, which would have been another opportunity for Dr. Marshall to observe ALH's severe weight loss while ensuring proper dosage.

162.    Tenex can have a sedative effect, which can be compounded by and potentially contraindicated for taking other sedatives simultaneously.

163.    Dr. Marshall had ALH on both prescriptions for Tenex and melatonin at the time of ALH's death.

164.    Dr. Dunn informed law enforcement that "if you are using [guanfacine] in conjunction with Melatonin or Benadryl, that can just further compound that [sedating] affect, so you could be extra tired if you combined them."

165.     Potential side effects for guanfacine include anxiety, nervousness, hallucinations (especially in children), severe drowsiness, slow heartbeats, light-headedness, dizziness, unusual tiredness or weakness, chest pain, difficulty breathing, and chest tightness.

### Deliberate Indifference and Negligence Finally Takes ALH's Life

166.     On November 6, 2017, Sherrie bound ALH in bedsheets and blankets and left her alone and immobilized in her bedroom.

167.     Sherrie also sedated ALH with the sedatives prescribed by Dr. Marshall, which would have made it more difficult for ALH to remain conscious, cry for help, or physically help herself.

168.     Several hours passed before Bryce checked on ALH.

169.     Bryce found ALH stiff and lifeless with a blanket wrapped around her neck.

170.     The Dirks called 911.

171.     Frist responders arrived and reported these disturbing facts:

   o  "She was cold to the touch."

   o  "I could not find a pulse."

   o  "When I tried to open her mouth to check inside I found that her jaw was already locked tight."

   o  "I was trying to open her mouth to start the breathing mask over it."

   o  "There was no way of opening her mouth at this time."

172.     ALH was pronounced dead on the scene.

173.     An officer on scene reported bruises on ALH's cheek, above her eye, on her neck and on her right toe.

174.    Doherty, Dr. Marshall, and Nurse Medhanie all had the opportunity and ability to have prevented ALH from being in the Dirks' home on November 6, 2017, but they failed to do so.

### The Autopsy, Charges, and Aftermath

175.    The Hennepin County Medical Examiner's Office conducted an autopsy on ALH.

176.    The autopsy reported that ALH had contusions on her face, left buttocks, left upper and both lower extremities.

177.    ALH also had abrasions on her neck, thumb and lower extremities.

178.    The autopsy reported that ALH was dehydrated and extremely underweight. In fact, the autopsy reported that ALH was in the 5th percentile for weight her age at the time of her death.

179.    ALH's blood also tested positive for two different sedatives, diphenhydramine and guanfacine.

180.    When Liz Krough, the Supervisor for the Social Worker Unit at Hennepin County heard about the Dirks' "swaddling" ALH following her death, she stated in an email to the Hennepin County social workers: **"This is a blatant safe sleep violation with the most severe consequences for this poor little baby.  So heartbreaking….."** (emphasis added).

181.    In the same email chain, Doherty claimed that she "**never heard they were swaddling.**"  (emphasis added).

182.    Doherty's statement is false.

183.    There are numerous records in ALH's file with Hennepin County that reflect

22

that the Dirks' were "swaddling" ALH for sleeping and behavioral purposes, and Doherty knew that.

184.    Doherty denied her knowledge of "swaddling" because she knew it to be contrary to accepted standards of care and practices both at Hennepin County, statewide, and on a national basis.

185.    Indeed, after ALH's death, Bryce told the police that he informed Doherty and Hennepin County that they were swaddling ALH: **"I said, you know this is how we're swaddling her, this is how long we're swaddling her.  I mean, is there any concern with that?"** (emphasis added).

186.    Doherty knew the Dirks were restraining ALH in bedsheets and blankets, yet she did nothing to stop it.

187.    Sherrie also informed Doherty on multiple occasions that the Dirks could not care for ALH if they did not receive additional help by way of medical or mental health resources, which the Dirks largely did not receive.  Upon information and belief, Sherrie provided similar information to Dr. Marshall and Nurse Medhanie.

188.    Doherty knew that the ACT Team was available to help ALH, but failed to ensure that ALH received care from that team or other appropriate medical and mental health providers.

189.    After ALH's death, Hennepin County terminated the Dirks' foster license.

190.    The Dirks' four kids and ALH's brother were removed from the Dirks' custody and their parental rights were terminated.

191.    Both Bryce and Sherrie Dirk were indicted by a grand jury on first-degree and second-degree murder charges.

23

192.    They each pled guilty to second degree unintentional murder with three aggravating factors: (1) the child was particularly vulnerable because of her young age, (2) the Dirks were in a position of authority, and (3) the child was left alone for several hours and the Dirks knew she was in a weakened state because of how they had treated her.

193.    The Court sentenced Sherrie Dirk to 384 months in prison, an upward departure from the sentencing guidelines.  She is currently serving her sentence in MCF-Shakopee.

194.    The Court sentenced Bryce Dirk to 150 months in prison.  He is currently serving his sentence in MCF-Moose Lake.

### Hennepin County's Widespread Problem of Indifference

195.    Hennepin County and its employees have a continuing, widespread, and persistent pattern of ignoring the safety, mental health, and well-being of foster children in their care.

196.    ALH is not the first child to die because of Hennepin County's deliberate indifference.

197.    In December 2014, a six-year-old foster child, KZJ, hung herself with a jump rope from her bunk bed.

198.    Like ALH, KZJ exhibited multiple signs of serious physical and mental health needs after being placed with her foster family.

199.    Like ALH, KZJ never received the necessary medical and mental health treatment that could have prevented KZJ's death, despite Hennepin County's knowledge of the risk of harm and the need for such treatment.

200.    Like ALH, KZJ died in foster care because of Hennepin County's deliberate

24

indifference to the child's safety and serious medical needs.

201.     Hennepin County is aware of this unconstitutional misconduct but continues to do nothing to fix it, putting countless children at risk.

202.     Following KZJ's death in 2014, the patterns and practices of Hennepin County Child and Family Services (CFS) came under intense scrutiny and the evidence uncovered was shocking.

203.     Hennepin County commissioned a report from the Casey Family Programs Assessment Team ("Casey").

204.     In its June 6, 2015 Memo (the "Casey Report"), Casey noted that: "In the months leading up to this assessment project, several high-profile deaths of children involved in Minnesota's child welfare system received widespread media attention throughout the state. Hennepin County CFS, the largest child welfare agency in the state, received particular attention regarding concerns related to child protection practices."

205.     From the outset, the Casey Report reflects the appalling dysfunctional nature of CFS:

> Some caseworkers expressed concern about possible consequences for participating in this assessment project, and our team was told that other staff chose not to participate due to fear of retribution. One participant shared that staff had been asked to record names of those participating in our focus groups. The Assessment team also observed a lack of trust between and among staff with different functions. This lack of interpersonal trust among staff at all levels was a recurrent theme throughout the assessment.

206.     The Casey Report also reflected that CFS's negative reputation has made it increasingly difficult to hire experienced staff, and that many CFS units have been required to hire younger caseworkers who lack valuable field experience.

207.    The Casey Report made the following additional findings:

o   A number of focus groups and participants noted that CFS has
    experienced a series of severe budget cuts [starting in 2008] from
    both state and county levels, and that these reductions in funding
    have had a negative impact on child safety.

o   Participants overwhelmingly agreed that system resources were
    inadequate to meet the operational needs of the agency, as well
    as the needs of children and families. System resources were
    mentioned as inadequate 95 times by focus group and interview
    participants, compared to zero times as adequate. As a result of
    budget cuts, the county has reduced and limited its child
    protection efforts through repeated programmatic staffing and
    service reductions.

o   Overwhelming workload was mentioned 172 times, compared
    with 2 times where the workload was described as manageable
    or sometimes manageable. Some participants provided examples
    of how unmanageable workload results in compromises to child
    safety. One participant stated: "You can't do a good job any
    more. It feels unsafe. Kids are going to get hurt. It's going to
    happen."

o   In sum, Hennepin County CFS fares worse on measures of child
    safety than many other counties in the state.

o   Hennepin County is well above the national standard of 5.4%
    for recurrent maltreatment.

208.    ALH's death was a result of Hennepin County's custom and practice of
deliberate indifference to foster children's safety and serious mental and physical medical
needs.

209.    Hennepin County's custom and practice of deliberate indifference in the
foster care system is also supported by the facts underlying class action proceeding against
Hennepin County in *T.F. v. Hennepin County*, Case No. 17-cv-1826 (PAM/BRT), which
was filed several months before ALH's death.

210.    Despite the death of KZJ, the facts alleged in *T.F.*, and the many other

known instances of harm or death to foster children in Hennepin County's care, Hennepin County employees, including Doherty, still left ALH to suffer a prolonged, painful, and cruel death.

## Count One
### 42 U.S.C. § 1983 – Fourteenth Amendment Violations
*Plaintiff v. Patricia Doherty*

211.    Plaintiff realleges each preceding paragraph as if fully set forth herein.

212.    Doherty had a constitutional duty to provide for ALH's medical needs, personal safety, and general welfare.

213.    ALH had objectively serious medical and mental health needs.

214.    ALH presented with objectively obvious and serious signs and symptoms of neglect and abuse.

215.    By the actions described above, Doherty, under color of state law, acted with deliberate indifference in her individual capacity to ALH's serious medical needs, personal safety, and general welfare.

216.    Doherty, acting under color of state law, knew of and disregarded an obvious and serious risk to ALH's health, safety, and welfare, and acted with deliberate indifference in violation of the Fourteenth Amendment to the United States Constitution.

217.    Doherty subjected ALH to these deprivations of her rights either maliciously or by acting with reckless disregard for whether ALH's rights would be violated by Defendants' actions.

218.    Doherty had reason to know that ALH was suffering from these constitutional violations. She had a realistic opportunity to intervene to stop these

constitutional violations, but either maliciously or with reckless disregard for whether ALH's rights would be violated failed to intervene.

219.    ALH died as a direct and proximate result of Doherty's acts and omissions, and Doherty is therefore liable.

220.    Plaintiff has standing to recover ALH's personal damages under federal common law, including medical and burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

221.    ALH's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support.

222.    Doherty subjected ALH to these deprivations of her rights in such a manner so as to render her liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

223.    Plaintiff is entitled to recover punitive damages.

224.    Plaintiff is entitled to recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## Count Two
### 42 U.S.C. § 1983 Violations Under *Monell v. Dept. of Social Servs.*
*Plaintiff v. Hennepin County*

225.    Plaintiff realleges each preceding paragraph as if fully set forth herein.

226.    Hennepin County, with deliberate indifference to the rights of ALH and other similarly situated foster children, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that were the moving force behind

ALH's death, examples of which are set forth below.

227.    Before and at the time ALH was placed in the Dirks' care, Hennepin County, with deliberate indifference to the rights of foster children, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of failing to monitor, coordinate the care for, and address the obvious and serious medical needs and obvious risk to the safety and welfare of Hennepin County foster children.

228.    Before and at the time ALH was placed in the Dirks' care, Hennepin County, with deliberate indifference to the rights of all foster children in Hennepin County, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of underfunding the Hennepin County Children and Family Services, particularly as it related to Child Protective Services, so that Hennepin County employees were incapable of monitoring, coordinating the care for, and addressing the obvious and serious medical needs and obvious risk to the safety and welfare of Hennepin County foster children.

229.    Before and at the time ALH was placed in the Dirks' care, Hennepin County, with deliberate indifference to the rights of all foster children in Hennepin County, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of licensing unsuitable foster parents and placing foster children with unsuitable foster parents.

230.    Before and at the time ALH was placed in the Dirks' care, Hennepin County, with deliberate indifference to the rights of all foster children in Hennepin County, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of failing to supervise, monitor, and investigate foster care providers which it

29

licensed and oversaw.

231.    Before and at the time ALH was placed in the Dirks' care, Hennepin

County, with deliberate indifference to the rights of all foster children in Hennepin County,

initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and

practice of failing to monitor, coordinate the care for, and address the obvious and serious

medical needs and obvious risk to the safety and welfare of foster children with serious

medical and mental health needs.

232.    ALH died as a direct and proximate result of the acts and omissions of

Hennepin County, and therefore Hennepin County is liable to Plaintiff.

233.    Plaintiff has standing to recover ALH's personal damages under federal

common law, including medical and burial expenses, pain and suffering before death, loss

of earnings, and hedonic damages, such as loss of enjoyment of life.

234.    ALH's next of kin have suffered pecuniary loss, including medical and

funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support.

235.    Plaintiff is entitled to recover his costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988.

## Count Three
### Medical Malpractice
*Plaintiff v. Dr. Robert Marshall, Kristen Medhanie, Allina Health System*

236.    Plaintiff realleges each of the preceding paragraphs as if fully set forth

herein.

237.    Allina's health care providers, including but not limited to Dr. Marshall and

Nurse Medhanie, had a duty to act within the standard of care required of medical

professionals in providing care to ALH.

238.    Allina's health care providers, including but not limited to Dr. Marshall and Nurse Medhanie, breached their duty to ALH to provide the standard of medical care required of them through the acts and omissions described above, and, as a result, were negligent.

239.    The breaches of the standard of care include but are not limited to:

- o  Dr. Marshall and Nurse Medhanie failing to investigate, diagnose, and report abuse and neglect to ALH by the Dirks;

- o  Dr. Marshall and Nurse Medhanie failing to conduct proper diagnostic tests of ALH;

- o  Dr. Marshall and Nurse Medhanie failing to make timely and/or necessary referrals to other medical and/or mental health providers;

- o  Dr. Marshall and Nurse Medhanie failing to ensure that referrals for necessary medical and mental health treatment were followed for ALH's serious medical and mental health needs, and make mandated reports if they were not; and

- o  Dr. Marshall's prescription of guanfacine/Tenex for ALH.

240.    Allina is liable for the acts and omissions of their individual employees under the doctrine of respondeat superior, including but not limited to Dr. Marshall and Nurse Medhanie's acts and omissions.

241.    These wrongful acts and omissions directly and proximately caused ALH's death and therefore these Defendants are liable to Plaintiff.

242.    As a result, ALH's next of kin have suffered pecuniary loss, including

medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

243.    In accordance with Minn. Stat. § 145.682, subd. 1, Plaintiff provides a Declaration of Expert Review herewith.

### Count Four

**Negligence**

*Plaintiff v. Doherty, Hennepin County, Sherrie Dirk, and Bryce Dirk*

244.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein.

245.    Each named Defendant in this Count had a duty to provide for the safety and welfare of ALH.

246.    Each of the individual Defendants in this Count breached their duty to provide for the safety and welfare of ALH by and through the acts and omissions described above, and, as a result, were negligent.

247.    Doherty failed to act in accordance with professional standards of care.

248.    Each of the individual Defendants in this Count also negligently disregarded the obvious risk of harm to ALH.

249.    Sherrie's negligence includes "swaddling" ALH and leaving her alone until she was found dead.

250.    Bryce's negligence includes failing to intervene in Sherrie's "swaddling" ALH and leaving her alone until she was found dead.

251.    Doherty and other Hennepin County employees breached numerous ministerial duties in the course of their negligence as described herein.

252.     Hennepin County was negligent in failing to properly train and supervise its employees to identify and report neglect and abuse.  Numerous breaches and failures occurred at the operational level.

253.     Hennepin County is liable for the acts and omissions of their individual employees, including but not limited to Doherty, under the doctrine of respondeat superior.

254.     The conduct set forth in all of the preceding paragraphs by the Defendants amounts to wrongful acts and omissions for the purposes of Minn. Stat. § 573.02, subd. 1.

255.     These wrongful acts and omissions directly and proximately caused ALH's death.

256.     As a result, ALH's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

257.     To the extent necessary as to Doherty and Hennepin County, in accordance with Minn. Stat. § 145.682, subd. 1, Plaintiff provides a Declaration of Expert Review herewith.

### **Prayer for Relief**

WHEREAS, Plaintiff Thomas Hunziker as trustee for the next of kin of ALH prays for judgment against Defendants as follows:

1.     As to Count One, a money judgment against Doherty for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988, and prejudgment interest;

2.     As to Count Two, a money judgment against Defendant Hennepin County,

33

for compensatory damages together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988, prejudgment interest, and appropriate injunctive relief necessary to cease the unconstitutional policies, practices, and customs described herein;

3. As to Count Three, a money judgment against defendants Dr. Robert Marshall, Nurse Kristen Medhanie, and Allina Health System, jointly and severally, for compensatory damages, together with prejudgment interest, costs and disbursements;

4. As to Count Four, a money judgment against defendants Patricia Doherty, Hennepin County, Sherrie Dirk, and Bryce Dirk, jointly and severally, for compensatory damages, together with prejudgment interest, costs and disbursements;

5. For such other and further relief as this Court deems just and equitable.

**NEWMARK STORMS DWORAK LLC**

Dated: October 19, 2020

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #0387240
Eric L. Newmark, #259792
Paul C. Dworak, #391070
Christopher L.B. Scott, #398535
150 South Fifth Street, Suite 1850
Minneapolis, MN 55402
Telephone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com
eric@newmarkstorms.com
paul@newmarkstorms.com
chris@newmarkstorms.com

*and*

**OLSON DEFENSE PLLLC**
Eric J. Olson, #0278427
8009 34th Ave. S.
Suite 1492
Bloomington, MN 55425
Telephone: 952.835.1088
Fax: 952.835.4660

*Attorneys for Plaintiff*